149 T.C. No. 3

UNITED STATES TAX COURT

GRECIAN MAGNESITE MINING, INDUSTRIAL & SHIPPING CO., SA,
Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 19215-12.                    Filed July 13, 2017.

          In 2001 P, a foreign corporation, purchased an interest in PS, a
U.S. limited liability company that was treated as a partnership for
U.S. income tax purposes.  From 2001 to 2008 income was allocated
to P from PS, and P paid income tax in the United States.  In 2008 P's
interest was redeemed by PS, and P received two liquidating
payments, one in July 2008 and the second in January 2009 but
deemed to have been made on December 31, 2008.  P realized gain
totaling over $6.2 million, of which $2.2 million was deemed
attributable to U.S. real property interests (and which P now concedes
is taxable income).  P contends that the remainder--"disputed gain" of
$4 million--is not taxable for U.S. purposes.  P timely filed a Form
1120-F, "U.S. Income Tax Return of a Foreign Corporation", for
2008, wherein it reported its distributive share of PS's income, gain,
loss, deductions, and credits, but did not report any income it received
from the redemption of its partnership interest (i.e., neither the now-
conceded real estate gain nor the disputed gain).  P did not file a
return or pay any income tax in the United States for 2009.  P's

reporting position was recommended to it by an experienced certified public accountant ("C.P.A.") who was recommended to P by its U.S. lawyer.

R prepared a substitute for return pursuant to I.R.C. sec. 6020(b) for P's 2009 year, and issued a notice of deficiency for 2008 and 2009, determining, inter alia, that P must recognize its gain on the redemption of its partnership interest for U.S. tax purposes as U.S.-source income that was effectively connected with a U.S. trade or business, consistent with Rev. Rul. 91-32. P timely filed a petition with this Court.

Held: P's disputed gain was capital gain that was not U.S.-source income and that was not effectively connected with a U.S. trade or business. This Court will not follow Rev. Rul. 91-32. P is therefore not liable for U.S. income tax on the disputed gain.

Held, further, as to the now-conceded tax liability for gain on the real estate, P is not liable for the I.R.C. sec. 6662(a) penalty for 2008 or the additions to tax under I.R.C. sec. 6651(a)(1) and (2) for 2009, because P reasonably relied on the erroneous advice of the C.P.A.

Michael J. Miller and Ellen S. Brody, for petitioner.

Gretchen A. Kindel and Emily J. Giometti, for respondent.

## CONTENTS

FINDINGS OF FACT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

    GMM . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
    Premier . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
    Redemption of GMM's membership interest in Premier . . . . . . . . . . . . . . 7
    Professional advice. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
    Tax returns . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
    IRS's determination of income tax liability. . . . . . . . . . . . . . . . . . . . . . . 11

OPINION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

    I.      Burden of proof . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
    II.    General legal principles . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

        A.    Basic principles of U.S. taxation of
              international transactions. . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
        B.    Basic principles of partnership taxation . . . . . . . . . . . . . . . . 14

    III.   Analysis as to gain from real estate . . . . . . . . . . . . . . . . . . . . . . . . 17
    IV.   Analysis as to disputed gain . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

        A.    The nature of the income under subchapter K . . . . . . . . . . . . 20
        B.    Effective connection of disputed gain. . . . . . . . . . . . . . . . . . 31

            1.    Rev. Rul. 91-32 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33
            2.    The default source rule and the
                "U.S. office rule" exception . . . . . . . . . . . . . . . . . . . 35
            3.    Attribution of the redemption of GMM's interest . . . . 37

                a.    Whether Premier's U.S. office was a
                      material factor in the production of
                      GMM's disputed gain. . . . . . . . . . . . . . . . . . . . . 38
                b.    Whether GMM's disputed gain was realized
                        in the ordinary course of Premier's business . . . 44
    V.    Penalties . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

A. Applicability of accuracy-related penalty for 2008 . . . . . . . . 48
B. Applicability of failure-to-file and failure-to-pay
additions to tax for 2009 . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48
C. Reasonable cause defenses . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

    1. Reasonable cause for failure to file and
failure to pay . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50
    2. Reasonable cause for an underpayment . . . . . . . . . . . 51
    3. GMM's reliance on professional advice. . . . . . . . . . . . 53

GUSTAFSON, <u>Judge</u>:  Pursuant to section 6212(a),[1] the Internal Revenue Service ("IRS") determined deficiencies in income tax for petitioner, Grecian Magnesite Mining ("GMM"), of $322,056 for 2008 and $1,780,563 for 2009.  The statutory notice of deficiency ("SNOD") issued to GMM on May 3, 2012, resulted from the IRS's determination that GMM must recognize as income, for the purpose of taxation within the United States, the gain it realized on the redemption of its interest in Premier Chemicals, LLC ("Premier").  The IRS also determined that GMM is liable for an accuracy-related penalty under section 6662(a) for 2008 and is liable for additions to tax for failure to timely file and pay under

---

[1]Unless otherwise indicated, all section references are to the Internal Revenue Code (26 U.S.C., "the Code") in effect for the years at issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.  Dollar and percentage amounts are broadly rounded.

section 6651(a)(1) and (2) for 2009. GMM timely petitioned this Court, pursuant to section 6213(a), for redetermination of these liabilities.

A portion of the gain that GMM realized from the redemption of its partnership interest in Premier pertained to Premier's U.S. real property interests, and GMM has now conceded that this portion is subject to U.S. income tax. Still in dispute, however, is the remainder of the gain, which is not attributable to real property ("the disputed gain"). Accordingly, the issues for decision are: (1) whether the disputed gain was U.S.-source income and was effectively connected with a U.S. trade or business (we hold that it was not U.S.-source income and was not effectively connected with a U.S. trade or business) and (2) whether, to the extent GMM is subject to tax, GMM is liable for additions to tax under section 6651(a)(1) and (2) and for a penalty pursuant to section 6662(a) (we hold that GMM is not liable for any additions to tax or penalty).[2]

---

[2]We need not decide the effect of the U.S.-Greece tax treaty--Convention for the Avoidance of Double Taxation and the Prevention of Fiscal Evasion with respect to Taxes on Income, Greece-U.S., February 20, 1950, T.I.A.S. No. 2902. GMM contends that even if U.S law otherwise imposes the tax liabilities at issue here, the treaty supersedes and eliminates the liabilities. Because we hold that the disputed gain is not taxable by the United States under our domestic law, we need not consider GMM's treaty-based argument. The Commissioner does not contend that the treaty imposes any U.S. tax beyond what our domestic law imposes.

FINDINGS OF FACT

GMM

At the time GMM filed its petition, its principal place of business was Athens, Greece.  GMM is a privately owned foreign corporation that was established in 1959 and was organized under the laws of Greece (officially the Hellenic Republic).  GMM's business includes extracting, producing, and commercializing magnesia and magnesite, which it sells to customers around the world.  Magnesite is a mineral that is used in a variety of commercial applications.  GMM owns magnesite deposits in Greece, has a research and development facility in Greece, and has an office in Greece.  Other than through its ownership interest in Premier, GMM had no office, employees, or business operation in the United States.  For U.S. tax purposes, GMM used a cash basis method of accounting.

Premier

Premier[3] is a limited liability company formed in the State of Delaware.  Premier is in the business of extracting, producing, and distributing magnesite which it mines or extracts in the United States.  During the years in issue, the office of Premier's headquarters was in Pennsylvania, and it owned mines or

---

[3]Premier was organized as Premier Chemicals, LLC, in January 2001, and it is now known as Premier Magnesia, LLC.

industrial properties in various States, including Nevada, Florida, and Pennsylvania. For all the years in issue, Premier was treated as a partnership for U.S. income tax purposes.

GMM entered into an operating agreement with Premier and Premier's other members in March 2001. GMM made an initial capital contribution to Premier of $1.8 million in exchange for a 15% interest in Premier. Accordingly, from March 2001 to February 2007 Premier allocated to GMM a distributive share of 15% of Premier's income, gain, loss, and deductions. In 2007 another corporation contributed property to Premier in exchange for a 15% membership interest, and thereafter GMM's membership interest in Premier (and consequently GMM's distributive share) was reduced to 12.6%.

Redemption of GMM's membership interest in Premier

In 2008 one of Premier's members, IMin Partners ("IMin") approached Premier and offered to sell Premier its entire membership interest for $10 million. Premier accepted IMin's offer. As a result of accepting IMin's offer, Premier was obligated to offer to purchase each member's interest for the same pro rata price that Premier had paid to IMin. GMM was the only other partner that chose to sell its interest.

On July 21, 2008, GMM entered into an agreement for Premier to redeem its 12.6% interest in Premier for $10.6 million; the redemption was to be effected by two equal transactions. GMM received the first payment of $5.3 million on July 31, 2008, in exchange for half of its membership interest. On July 31, 2008, GMM's adjusted basis in its membership interest was $4.3 million,[4] and it realized $1 million of gain on the first redemption payment. Also on July 31, 2008, Premier redeemed IMin's entire membership interest--which caused the remaining partners' membership interests (including GMM's) to increase proportionally.

As of December 31, 2008 (just before the exchange of its remaining membership interest in Premier), GMM's adjusted basis in the remaining portion of its interest was $55,000. On January 2, 2009, GMM received the second payment of $5.3 million from Premier in exchange for its remaining membership interest, realizing gain of over $5.2 million. Premier and GMM agreed that the effective date of the final transfer of GMM's interest in Premier was deemed to be

---

[4]GMM's adjusted basis in its membership interest increased and decreased between 2001 and 2008 on the basis of tax items which flowed through from Premier to GMM, and on account of a debt of Premier's that GMM guaranteed. GMM's full basis in its membership interest was $4.3 million on July 31, 2008, and the additional $55,000 of basis which was subsequently used against the second redemption payment was a result of income Premier realized in the second half of 2008 and allocated to GMM in accordance with the latter's equity interest percentage.

December 31, 2008, and that GMM would not thereafter share in any profits or losses in Premier or otherwise be deemed a member of Premier.[5] The parties also agree that, of the $6.2 million of gain that GMM realized in the two payments, $2.2 million (i.e., the entire $1 million of the first payment and $1.2 million of the second) was attributable to Premier's U.S. real estate.

Professional advice

In 2001 GMM hired attorney John Phufas to handle all of its legal business and tax obligations in the United States, including its investment in Premier. Mr. Phufas later referred GMM to Elihu Rose for tax return preparation. Mr. Rose was a certified public accountant with numerous partnership clients whose returns he regularly prepared, but GMM was his first non-U.S. client. Mr. Rose thereafter prepared GMM's U.S. income tax returns for 2003 through 2008. Mr. Rose received from Premier Schedules K-1, "Partner's Share of Income, Deductions, Credits, etc.", on behalf of GMM and consulted with Premier regarding those forms. When necessary, Mr. Rose asked Premier for supplemental information in order to prepare GMM's returns.

---

[5]As between GMM and Premier, the second payment was deemed made in December 2008. But in fact the payment was made in January 2009; and GMM and the Commissioner agree that, to the extent the second payment is taxable income to GMM, it is taxable for 2009.

Tax returns

With its 2008 Form 1065, "U.S. Return of Partnership Income", Premier included a Schedule K-1 for GMM that reported GMM's share of Premier's income, gain, loss, deductions, and credits for 2008. Consistent with that Schedule K-1, Mr. Rose prepared and GMM timely filed a Form 1120-F, "U.S. Income Tax Return of a Foreign Corporation", for 2008, on which GMM reported its distributive share of Premier's income, gain, loss, deductions, and credits. However, pursuant to Mr. Rose's advice, GMM did not report on that 2008 return any of the gain it had realized that year on the redemption of its interest in Premier--that is, neither the gain attributable to the U.S. real estate nor the rest of the gain.

With its 2009 Form 1065, Premier included a Schedule K-1 for GMM that reported a zero balance in GMM's capital account and, consistent with the agreement between GMM and Premier that the redemption of GMM's entire interest was effective as of December 31, 2008, did not attribute to GMM any income, gain, loss, deductions, or credits for 2009. Pursuant to Mr. Rose's advice, GMM did not file a return for 2009.

IRS's determination of income tax liability

The IRS conducted an audit for GMM's 2008 and 2009 tax years. Pursuant to section 6212(a), the IRS determined deficiencies in GMM's U.S. income tax for those years. For 2009 the IRS prepared a substitute for return pursuant to section 6020(b); and on May 3, 2012, the IRS issued an SNOD to GMM for both years. The SNOD determined that GMM should have recognized U.S.-source capital gain net income of $1 million for 2008 and $5.2 million for 2009 from the redemption of its interest in Premier. Those determinations were based on the IRS's conclusion that, as a result of GMM's membership interest in Premier, GMM's capital gain was effectively connected with a trade or business engaged in within the United States.[6] The SNOD also determined that for 2008 GMM was liable for an accuracy-related penalty and for 2009 was liable for additions to tax under section 6651(a)(1) and (2) for failure to timely file a return and failure to timely pay the tax shown on the SFR.

The parties now agree that the $1 million gain that GMM realized for 2008 from the first payment and $1.2 million of the gain it realized for 2009 from the

---

[6]The only other adjustment the IRS made to GMM's Form 1120-F for 2008 (apart from the proposed gain on the redemption of its partnership interest) was an increase in allowable deductions under section 199 that arises automatically on account of an increase in taxable income from the gain on the redemption.

second payment are attributable to the sale of U.S. real property pursuant to section 897(g) and are thus considered U.S.-source income effectively connected with GMM's U.S. trade or business. The parties dispute whether the remaining gain from the redemption of GMM's interest in Premier, approximately $4 million, is U.S.-source income that is effectively connected with a trade or business in the United States and thereby subject to taxation in the United States.

OPINION

## I.    Burden of proof

In general, the IRS's notice of deficiency is presumed correct, "and the petitioner has the burden of proving it to be wrong". Welch v. Helvering, 290 U.S. 111, 115 (1933); see also Rule 142(a).[7] In cases involving unreported income, "before the Commissioner can rely on this presumption of correctness, the Commissioner must offer some substantive evidence showing that the taxpayer received income from the charged activity." Weimerskirch v. Commissioner, 596 F.2d 358, 360 (9th Cir. 1979), rev'g 67 T.C. 672 (1977). The parties have stipulated that the amounts listed as capital gain on the SNOD are the amounts

---

[7]The Commissioner seems to assert that under section 7491(c) he bears the burden of production as to penalty; but that provision applies only "with respect to the liability of any individual for any penalty". (Emphasis added.) See NT, Inc. v. Commissioner, 126 T.C. 191, 194-195 (2006).

GMM realized on the redemption for both years, so the Commissioner has made the required showing, and the burden of proof is on GMM.

## II.     General legal principles

This case arises at the intersection of two areas of tax law--i.e., partnership taxation (subchapter K of the Code) and U.S. taxation of international transactions (subchapter N of the Code).  We state first the relevant general principles of each of those areas before analyzing their interaction in the circumstances of this case.

### A.     Basic principles of U.S. taxation of international transactions

The Code provides for U.S. taxation of the income of a foreign corporation[8] if either:  (1) under section 881 that income is "received from sources within the United States" (i.e., is "U.S.-source income"), sec. 881(a), and is one of several kinds of income, including "fixed or determinable annual or periodic" income (i.e., "FDAP income"), sec. 881(a)(1) or (2) under section 882 the income of a "foreign corporation engaged in trade or business within the United States during the

---

[8]Section 7701(a)(5) defines a foreign corporation as one that is "not domestic."  Section 7701(a)(4) explains that "'domestic' when applied to a corporation or partnership means created or organized in the United States or under the law of the United States or of any State unless, in the case of a partnership, the Secretary provides otherwise by regulations."

taxable year" is "effectively connected with the conduct of" that trade or business.[9] The Commissioner does not contend that the disputed gain is income of the sort addressed by section 881, and we can therefore focus on section 882 and the question whether GMM's gain was effectively connected with a U.S. trade or business of GMM.

B.    Basic principles of partnership taxation

Section 701 provides: "A partnership * * * shall not be subject to the income tax imposed by this chapter. Persons carrying on business as partners shall be liable for income tax only in their separate or individual capacities." In determining its individual income tax, each partner must separately include its distributive share of the entity's taxable income or loss, sec. 702(a), and the partnership's income is taxable to the partner to the extent of its distributive share, sec. 702(c). In this context, the partnership is conceived of not as having its own distinct legal existence but simply as being an "aggregation" of the partners.

---

[9]Section 875(1) provides: "[A] nonresident alien individual or foreign corporation shall be considered as being engaged in a trade or business within the United States if the partnership of which such individual or corporation is a member is so engaged". GMM does not dispute that under section 875(1) it was "engaged in a trade or business within the United States" within the meaning of section 882(a)(1).

GMM paid income tax under those principles before the redemption transaction at issue here.

When a partnership redeems a partner's interest in the partnership by making a payment to the partner, section 736(b)(1)[10] provides that such liquidating payments "be considered as a <u>distribution</u> by the partnership". (Emphasis added.) Section 731(a) in turn provides: "In the case of a distribution by a partnership to a partner-- * * * [a]ny gain or loss recognized under this subsection shall be considered as gain or loss <u>from the sale or exchange of the partnership interest</u> of the distributee partner." (Emphasis added.) Section 741 provides, as a general rule, that "[i]n the case of a sale or exchange of an interest in a partnership, gain or loss shall be recognized to the transferor partner. Such gain or loss shall be considered as gain or loss <u>from the sale or exchange of a capital asset</u>". (Emphasis added.) This statute thus suggests that, in this context, the partnership is conceived of as an entity distinct from the individual partners, and a partner pays tax on the sale of its partnership interest, in a manner broadly similar to the manner in which it might pay tax on the sale of an interest in a corporation. (For reasons we discuss below, this conception affects the taxability of such gain.)

_____

[10]The parties agree that section 736(a) does not apply to the disputed gain.

The Commissioner sees it otherwise, however, and one way of describing the dispute in this case is to say it raises the question whether, as to a foreign partner's liquidation of its interest in a U.S. partnership, the "entity" approach applies (as GMM contends) so that the gain arises from the sale of a single asset (i.e., GMM's interest in the U.S. partnership), or instead the "aggregation" approach applies (as the Commissioner contends), so that the gain arises from the sale of GMM's interest in the assets that make up the partnership's business, in which business GMM is conceived of as having been engaged. The Code reflects both approaches, in different contexts. The aggregate approach arises from the observation that a partnership is an aggregation of individuals, while the entity approach applies where the Code focuses on the distinct legal rights that a partner has in its interest in the partnership entity, distinct from the assets the partnership itself owns. See 1 William S. McKee, et al., Federal Taxation of Partnerships and Partners, para. 1.02, at 1-8 (4th ed. 2007). Subchapter K adopts the entity or the aggregate approach depending on the context, and "[t]he entity approach * * * predominates in the treatment of transfers of partnership interests as transfers of interests in a separate entity rather than in the assets of the partnership." Id. at 1-9.

III.    Analysis as to gain from real estate

The interaction of the foregoing principles is easiest to describe in connection with an issue as to which the parties now agree: Notwithstanding the generality of section 741 that the sale of a partnership interest is the sale of a capital asset, in which the partner and the partnership are distinct entities, GMM is nonetheless concededly subject to tax on the portion of its gain that arose from Premier's real property, under provisions that clearly reflect the "aggregation" approach. In passing the Foreign Investment in Real Property Tax Act of 1980 ("FIRPTA"),[11] Congress sought, inter alia, to impose income tax on foreign corporations that sell interests in partnerships that own U.S. real property interests. Accordingly, section 897(g) provides:

---

[11]The Foreign Investment in Real Property Tax Act of 1980 ("FIRPTA") is subtitle C of Title XI of the Omnibus Reconciliation Act of 1980, Pub. L. No. 96-499, sec. 1122, 94 Stat. at 2682.

SEC. 897(g). Special Rule for Sales of Interest in Partnerships, Trusts, and Estates.--Under regulations prescribed by the Secretary, the amount of any money, and the fair market value of any property, received by a nonresident alien individual or foreign corporation in exchange for all or part of its interest in a partnership, trust, or estate shall, to the extent attributable to United States real property interests,[12] be considered as an amount received from the sale or exchange in the United States of such property. [Emphasis added.]

The parties have stipulated that $2.2 million of the gain GMM realized on the redemption of its partnership interest was attributable to U.S. real property interests and thus U.S.-source income pursuant to section 897(g). Thus, in effect, the law disregards the partnership entity to this extent, treats it as a mere aggregation of its partners, and taxes the partner not as if it had sold its partnership interest but as if it had sold its portion of the real property interests held in the partnership.

---

[12]We note that, by its express terms, section 897(g) is, as its heading states, a "Special Rule", and its text mandates an aggregation approach for characterizing gain only "to the extent attributable to United States real property interests". The heading thus "correspond[s] to the text" and "confirm[s] our reading of the text of the statute." Abdel-Fattah v. Commissioner, 134 T.C. 190, 205 (2010) (construing sec. 893). This statute presumes the existence of a general rule to which this aggregation approach is an exception. Section 897(g) does not provide (and the Commissioner does not contend that it provides) a general rule that all gain from a foreign partner's sale of its partnership interest shall be considered an amount received from the sale of the partnership's properties of whatever types. The challenge that the Commissioner faces in this case is to find somewhere in the Code either a general "aggregation theory" rule or a relevant exception to the general "entity theory" rule that we discern, as explained in part II.B above.

GMM acknowledges that when, under section 897(g), we look through the entity of the partnership and consider GMM as the owner (and seller) of its portion of Premier's real property interests, the FIRPTA gain attributable to those interests was treated as "effectively connected with the conduct of" GMM's trade or business. Under section 882, then, this gain was subject to U.S. income tax, and GMM so concedes.

Such FIRPTA gain is thus an instance in which a partnership is treated as an aggregation, and this treatment demonstrates that the "entity" generality of sections 731, 736, and 741 admits exceptions. We must decide whether there exists an equivalent exception relevant to the disputed gain.

IV.    Analysis as to disputed gain

As to GMM's non-FIRPTA, disputed gain, we must determine whether, under section 882(a)(1), the gain was "effectively connected with the conduct of a trade or business within the United States". To begin, however, we determine the nature of that gain by looking again at the provisions of subchapter K as to the character of the gain from the liquidation of a partnership interest, and we then look at the effect of the pertinent provisions to determine whether that gain is "effectively connected" to the trade or business of Premier (which is attributed to GMM).

A.     The nature of the income under subchapter K

The parties agree that the transaction between GMM and Premier was a redemption. The payments GMM received in the liquidation of its partnership interest were, in the words of section 736(b)(1), "made in exchange for the interest of such partner [i.e., GMM] in partnership property", and therefore they are to "be considered as a <u>distribution</u> by the partnership". (Emphasis added.) The effect of such a "distribution" is governed by section 731(a), which provides: "In the case of a <u>distribution</u> by a partnership to a partner-- * * * [a]ny gain or loss recognized under this subsection shall be considered as gain or loss from the <u>sale or exchange</u> <u>of the partnership interest</u> of the distributee partner." (Emphasis added.) That is, when a partner liquidates its partnership interest and is paid for its interest in the partnership's property, then under section 736(b)(1) the payment is "considered as a distribution"; and under section 731(a) the gain is considered to arise from "the sale or exchange <u>of the partnership interest</u>", i.e., not from the sale or exchange of the partner's portion of individual items of partnership property.[13]

---

[13]Application of the entity approach in this context is further supported by the general rule that if a partnership distributes enough money to a partner to generate gain, then that gain is calculated by subtracting the partner's basis in its partnership interest from the amount of money distributed--rather than subtracting that partner's share of basis in a fractional share of multiple entity-owned assets from the amount of money distributed. <u>See</u> sec. 731(a)(1). (For different

(continued...)

GMM acknowledges that, for purposes of section 731, it recognized gain as a result of the distributions by Premier, and it points to section 741 to demonstrate that such gain on liquidation is capital, just as if GMM had sold the partnership interest. Section 741 provides:

> SEC. 741.   RECOGNITION AND CHARACTER OF GAIN OR LOSS ON SALE OR EXCHANGE.
>
>    In the case of a sale or exchange of an interest in a partnership, gain or loss shall be recognized to the transferor partner. Such gain or loss shall be considered as gain or loss <u>from the sale or exchange of a capital asset</u>, except as otherwise provided in section 751 (relating to unrealized receivables and inventory items).

GMM cites our decision in <u>Pollack v. Commissioner</u>, 69 T.C. 142 (1977), and argues that in this case, as in <u>Pollack</u>, we must apply the "entity theory", which generally gives independent tax effect to transactions between a partner and a partnership, or to transactions involving a partnership interest. In <u>Pollack</u> it was the taxpayer who asserted the "aggregation theory", because losses (not gains) of the partnership's business were at issue, and the taxpayer wanted to claim not capital losses but ordinary losses, as if he himself had been engaged in the business. "Respondent, on the other hand, contends that except for specific

[13](...continued)
treatment in different circumstances, see sec. 751(b) ("considered as a sale or exchange of such property between the distributee and the partnership") and 26 C.F.R. sec. 1.751-1(g), <u>Example</u> (2)(d)(1), Income Tax Regs.)

exceptions not relevant herein, section 741 mandates the loss be characterized as a capital loss." Id. at 145.  We held for the Commissioner and explained:

> [B]oth the legislative history of section 741 and its language indicate that Congress intended it to operate independently of section 1221 so as to be dispositive of the character of petitioner's loss.
>
> Section 741 was enacted by Congress as part of subchapter K of the Internal Revenue Code of 1954. * * *
>
> *     *     *     *     *     *     *
>
> Prior to 1950 the Government took the position, under the so-called aggregate theory of partnership, that the selling partner actually sold his undivided interest in each of the partnership's assets, and the character and amounts resulting from the disposition of those assets should be considered individually. * * *
>
> *     *     *     *     *     *     *
>
> This position, however, found no acceptance in the courts, which consistently held a partnership interest to be a capital asset in its entirety regardless of the nature of the underlying partnership assets.  In response, the Government in 1950 reversed its position in G.C.M. 26379,[14] 1950-1 C.B. 58 * * *

---

[14]In G.C.M. 26379, 1950-1 C.B. 58, the Commissioner held that "the sale of a partnership interest should be treated as the sale of a capital asset" and acknowledged:

> The overwhelming weight of authority is contrary to the position heretofore taken by the Bureau, viz., that the sale of a partnership interest is a sale of the selling partner's undivided interest in each specific partnership asset.

\*    \*    \*    \*    \*    \*    \*

> Congress, in the 1954 Code, sought to eliminate the confusion on this point by codifying the Government's concession in G.C.M. 26379 and, at the same time, reduce the availability of the collapsible partnership as a tax avoidance dvice.  Congress accomplished its dual purpose by enactment of section 741, which treated the sale of a partnership interest as the sale of a capital  asset, and section 751, which specifically excluded from capital gain or loss treatment that portion of the partnership interest representing income from unrealized receivables and substantially appreciated inventory items.
>
> In view of the foregoing legislative record and the plain language of the statute itself, we conclude that Congress intended section 741, if applicable, to provide capital gain or loss treatment on the sale or exchange of a partnership interest by a partner without regard to section 1221.  Indeed, congressional use of the phrase "shall be considered as" in section 741 is unambiguous and mandatory on its face. \* \* \*

Id. at 145-147 (citations and fn. refs. omitted).

GMM argues that "the sale of a partnership interest is respected as the sale of an indivisible item of intangible personal property, and may not be recharacterized \* \* \* as the sale of separate interests in each asset owned by the partnership."  That is, GMM argues that the general principle of section 741, effecting the "entity theory", should apply here.

The Commissioner acknowledges the general principle but argues[15] that in this context we should nonetheless employ the "aggregate theory", that is, that we should treat the partner's sale of a partnership interest as the partner's sale of separate interests in each asset owned by the partnership. As for section 741, the Commissioner argues that the statute cannot be interpreted to require that the sale (or liquidation) of a partnership interest be treated as the sale of an indivisible asset irrespective of the context, because then section 897(g)--whose operation is conceded here, see supra part III.A--would be inoperable. The Commissioner states:

> The sale of a partnership interest cannot simultaneously be both (a) a sale of an indivisible asset, as petitioner argues is required by section 741, and (b) a sale of U.S. real property interests and a sale of a partnership interest, as required by section 897(g).

The Commissioner posits that the only way to reconcile the two provisions is to interpret section 741 as applicable only to the character of the gain recognized-- i.e., as capital rather than ordinary. That is, the Commissioner maintains that while section 741 expressly requires that the gain "shall be considered as gain or

---

[15]The Commissioner does not argue that the partnership anti-abuse regulation, 26 C.F.R. sec. 1.701-2(e), Income Tax Regs., applies in this case. That regulation provides that the IRS can "treat a partnership as an aggregate of its partners in whole or in part as appropriate to carry out the purpose of any provision of the Internal Revenue Code or the regulations". See id.

loss from the sale or exchange of a capital asset", the statute does not preclude treating the (capital) gain as arising not from the sale of the partnership interest per se (which the entity theory would yield) but from the partnership's underlying assets that give value to the partnership interest (which the aggregation theory would yield).

It is true that, in providing that the gain "shall be considered as gain * * * from the sale or exchange of a capital asset", section 741 does not specify which asset. However, there are four flaws in the Commissioner's approach that cause us to reject it. First, he exaggerates the conflict between an "entity theory" construction of section 741 and the existence of an exception in section 897(g). In its own terms, section 741 acknowledges one exception ("except as otherwise provided in section 751"),[16] so section 741 is only a general rule, not a rule of

---

[16]Section 751 is a specific exception to section 741 that causes unrealized receivables and inventory items to be addressed separately from the remainder of the partnership interest when that interest is sold or liquidated. In the context of liquidating distributions, the partnership is deemed to have bought the liquidated partner's share of those assets from that partner, so that that partner has gain of a character and amount consistent with such a hypothetical sale. The IRS did not assert application of section 751(b) in the SNOD, and the Commissioner has not asserted it as an alternative position in this case. Consequently, we do not consider section 751 further. We note that by the express terms of section 741, section 751 is (like section 897(g); see supra note 11) an exception, and it mandates an "aggregation" approach for characterizing only gain "attributable to" unrealized receivables or inventory items". This statute thus presumes the

(continued...)

absolute and universal application. Congress is always free, having enacted a general rule, to enact exceptions.

Second, the Commissioner's reading of section 741 gives insufficient effect to one word in the statute. Section 741 provides that income realized on the sale of a partnership interest "shall be considered as gain * * * from the sale or exchange of a capital <u>asset</u>". (Emphasis added.) Congress used the singular "asset", rather than the plural "assets". This singular wording is more consistent with the treatment of the sale of a partnership interest according to the entity theory, under which the selling partner is deemed to have sold only one asset (its partnership interest) rather than being deemed to have sold its interest in the multiple underlying assets of the partnership. See also <u>P.B.D. Sports, Ltd. v. Commissioner</u>, 109 T.C. 423, 438 (1997) ("Generally, subchapter K employs the entity approach in treatin[g] transfers of partnership interests. The sale of a partnership interest is treated as the sale of a single capital asset rather than as a transfer of the individual assets of the partnership. See secs. 741 and 742.");

---

[16](...continued)
existence of a general rule to which this aggregation approach is an exception. Section 751 does not provide (and the Commissioner does not contend that it provides) a general rule that <u>all</u> gain from a partner's sale of its partnership interest shall be considered an amount received from the sale of the partnership's properties of whatever types.

Unger v. Commissioner, T.C. Memo. 1990-15 (listing section 741 as an example of the entity theory in the Internal Revenue Code), aff'd, 936 F.2d 1316 (D.C. Cir. 1991). And absent some overriding mandate, section 731 directs that gain or loss on a distribution (such as the one at issue) "shall be considered as gain or loss from the sale or exchange of the partnership interest of the distributee partner" (that is, as directed by section 741).

Third, Congress has explicitly carved out a few exceptions to section 741 that, when they apply, do require that we look through the partnership to the underlying assets and deem such a sale as the sale of separate interests in each asset owned by the partnership. If Congress had intended section 741 to be interpreted as a look-through provision, these exceptions in sections 751 and 897(g) would be superfluous. See TRW Inc. v. Andrews, 534 U.S. 19, 31 (2001).

Accordingly, the enactment of section 897(g) actually reinforces our conclusion that the entity theory is the general rule for the sale or exchange of an interest in a partnership. Without such a general rule, there would be no need to carve out an exception to prevent U.S. real property interests from being swept into the indivisible capital asset treatment that section 741 otherwise prescribes.

Fourth, section 731(a)--brought into this analysis by the express wording of section 736(b)(1)--makes explicit that the "entity theory" generally applies to a partner's gain from a distribution:

> Any gain or loss recognized under this subsection shall be considered as gain or loss <u>from the sale or exchange of the partnership interest</u> of the distributee partner.

Sec. 731(a) (emphasis added).  This wording could hardly be clearer.  The partnership provisions in subchapter K of the Code provide a general rule that the "entity theory" applies to sales and liquidating distributions of partnership interests--i.e., that such sales are treated not as sales of underlying assets but as sales of the partnership interest.  Of course, Congress may enact exceptions or different rules, such as for foreign partners, and we consider that possibility below; but we begin our analysis with this generality from subchapter K.

The Commissioner's interpretation of the Code acknowledges the same sequence we have followed--i.e., that section 736(b)(1) leads to section 731, which in turn leads to section 741, but he evidently thinks such an analysis stops short. The Commissioner apparently maintains that, after applying those sections in that order, one must still return to section 736(b)(1)--so that, while section 741 mandates the capital character of the income, in the end the distribution is still characterized as "payments * * * made in exchange for the interest of such partner

in partnership property". Sec. 736(b)(1) (emphasis added). The emphasized

phrase certainly does appear in section 736(b)(1), and the analysis in this case

begins there precisely because GMM did indeed receive payments that, given the

nature of a partnership, can be said to have been made ultimately in exchange for

GMM's interest in the partnership's various items of property. However,

sections 736(b)(1), 731(a), and 741 tell us what to do with such payments for tax

purposes; and as we have shown, they direct us to a conclusion: "gain or loss

from the sale or exchange of the partnership interest", sec. 731(a), which is "a

[singular] capital asset", sec. 741. We see no reason to abandon that conclusion,

return to section 736(b)(1), and halt at the phrase that most nearly coincides with

the Commissioner's position.[17]

The Commissioner also argues that section 741 should not be applied to

characterize the income at issue because applying it in that manner would

---

[17]Indeed, when we read section 736(a) and (b) together, it becomes clear that the role of the words "partnership property" in section 736(b) is to distinguish distributions made for such property from those made out of a partner's "distributive share" of entity-level partnership income (as in section 736(a)(1)) or as a "guaranteed payment" (as in section 736(a)(2)). A partner's "distributive share", sec. 736(a)(1), is governed by sections 704(b) and 701; the tax treatment of a "guaranteed payment", sec. 736(a)(2), is provided in section 707(a); and payments for partnership property, sec. 736(b), are "considered as a distribution by the partnership"--i.e., are treated as provided in section 731. In none of these instances is the ultimate tax treatment of the transfer of money or property from a partnership to a partner prescribed solely by reference to section 736.

contradict "Congress' intent in enacting section 865", the sourcing rule we discuss below in part IV.B. The Commissioner argues that, when addressing a partnership question under subchapter K of the Code (which deals primarily with partners and partnerships) and applying a Code section (such as section 865) that is outside of subchapter K, one must look to "the nature of the partnership interest involved, together with the intent and purpose of the non-subchapter K section being applied." Using this rule, the Commissioner explains that not section 741 but rather section 736(b)(1) more appropriately characterizes the type of income here-- i.e., as a payment for GMM's interest in the "partnership property". We see no basis for the Commissioner's selection of this particular phrase from section 736(b)(1) as the guiding star for navigating the intersection of partnership taxation and the taxation of international transactions, and we have already explained why this phrase is at the beginning and not the end of the analysis. More important, the Commissioner cites no authority for his posited rule, which seems (at least as he uses it here) to shortcut or distort the subchapter K analysis by invoking a purpose (not explicitly enacted) that he discerns in subchapter N. The Commissioner has not convinced us to reconsider the argument that we rejected 38 years ago when it was advanced by the taxpayer in Pollack. Addressing ourselves to the statutory text, we conclude that subchapter K mandates treating the disputed gain as capital

gain from the disposition of a single asset, and in part IV.B below we apply the provisions of section 865 accordingly.

In sum, section 736(b)(1) provides that payments such as those giving rise to the disputed gain "<u>shall</u> * * * be considered as a distribution by the partnership"; section 731(a) provides that such gain "<u>shall</u> be considered as gain * * * from the sale or exchange of <u>the partnership interest</u> of the distributee partner"; and section 741 provides that such gain "<u>shall</u> be considered as gain * * * from the sale or exchange of <u>a</u> capital <u>asset</u>". (Emphasis added.) Accordingly, GMM's disputed gain from the redemption of its partnership interest is gain from the sale or exchange of an indivisible capital asset--i.e., GMM's interest in the partnership.

## B. Effective connection of disputed gain

Having established that GMM's disputed gain arises from personal property[18] in the form of an indivisible capital asset, we now turn to the rules governing taxation of international transactions to determine whether that gain was taxable. That determination turns on whether, for purposes of section 882, that gain was "effectively connected with the conduct of a trade or business within

---

[18]The Commissioner does not deny that the disputed gain constitutes income from a sale of personal property.

the United States"--i.e., whether that gain was effectively connected with the trade or business of GMM's partnership, Premier, which trade or business is attributed to GMM as a partner by section 875(1).  See supra note 9.  "Effectively connected income" is defined in section 864(c), and it includes some income sourced within the United States, see sec. 864(c)(2) and (3), and some sourced without the United States, see sec. 864(c)(4).

As to "gain or loss * * * from the sale or exchange of capital assets" (i.e., the type of gain relevant here), section 864(c)(2) provides that such gain may be "effectively connected with the conduct of a trade or business within the United States" (depending on factors set out in the statute); but section 864(c)(2) applies only to "gain or loss from sources within the United States".  (Emphasis added.) Some types of foreign-source income are still treated as effectively connected income under section 864(c)(4)(B), but the Commissioner acknowledges that "the income at issue does not fall within the limited categories of section 864(c)(4)(B)."  Absent application of section 864(c)(4)(B), the disputed gain must be U.S.-source income to be effectively connected, and thus subject to tax under section 882.

1.     Rev. Rul. 91-32

The Commissioner would make this "effectively connected" analysis simple for the Court by having us defer to his conclusion in Revenue Ruling 91-32, 1991-1 C.B. 107, which holds that gain like GMM's disputed gain is effectively connected with a U.S. trade or business.  The Commissioner argues that we should give the ruling "appropriate deference".  The ruling contains three fact patterns, but the essential facts of all three mirror those of this case.  None of the three explicitly concludes with a liquidating distribution to the foreign partner (two end with a sale, and one ends with a "disposition" of the interest), but this is not a material distinction.

The ruling holds that the gain realized by a foreign partner upon disposing of its interest in a U.S. partnership should be analyzed asset by asset, and that, to the extent the assets of the partnership would give rise to effectively connected income if sold by the entity, the departing partner's pro rata share of such gain should be treated as effectively connected income.  In other words, the ruling essentially adopts the same analysis Congress prescribed in section 751 for inventory and receivables, except that the ruling applies that approach for a category of assets (i.e., effectively connected income-generating assets) different from the assets addressed in section 751.

- 34 -

Our level of deference to agency interpretations of law varies. Where the interpretation construes an agency's own ambiguous regulation, that interpretation is accorded deference, Rand v. Commissioner, 141 T.C. 376, 380-381 (2013) (citing Auer v. Robbins, 519 U.S. 452, 461 (1997)). On the other hand, where a revenue ruling improperly interprets the text of relevant statutes and has inadequate reasoning, we afford it no deference at all. PSB Holdings, Inc. v. Commissioner, 129 T.C. 131, 145 (2007). Between these poles, we follow revenue rulings to the extent that they have the "power to persuade". See id. at 144.

Rev. Rul. 91-32 is not simply an interpretation of the IRS's own ambiguous regulations, and we find that it lacks the power to persuade. Its treatment of the partnership provisions discussed above in part II.B is cursory in the extreme, not even citing section 731 (which, as we set out, yields a conclusion of "gain or loss from the sale or exchange of the partnership interest" (emphasis added)). The ruling's subchapter K analysis essentially begins and ends with the observation that "[s]ubchapter K of the Code is a blend of aggregate and entity treatment for partners and partnerships." We criticize the ruling's treatment of the subchapter N issues in notes 22 and 24 below. We decline to defer to the ruling. We will instead

follow the Code and the regulations to determine whether the disputed gain is effectively connected income.

### 2. The default source rule and the "U.S. office rule" exception

Following the progression of section 864(c), we begin by examining whether the disputed gain is U.S. source. Sections 861-863 and 865 make up most of the sourcing rules in the Code. There is no Code section that specifically provides the source of a foreign partner's income from the sale or liquidation of its interest in a partnership. Section 865 provides the default source rule for gain realized on the sale of personal property.

The default source rule for income from the sale of personal property is found in section 865(a), which provides:

> SEC. 865(a). General Rule.--Except as otherwise provided in this section, income from the sale of personal property--
>
> > (1) by a United States resident shall be sourced in the United States, or
>
> > (2) by a nonresident shall be sourced outside the United States.

The Commissioner does not dispute that GMM is a nonresident of the United States, and GMM argues that, under this default rule, the disputed gain is therefore foreign source. GMM is right, unless an exception intervenes.

The Commissioner argues, however, that the disputed gain falls under an exception to the default rule--namely, the "U.S. office rule" of section 865(e)(2)(A), which provides: "[I]f a nonresident maintains an office or other fixed place of business in the United States,[19] income from any sale of personal property (including inventory property) <u>attributable to such office</u> or other fixed place of business shall be sourced in the United States." (Emphasis added.) Thus, the disputed gain might be taxable under this exception if the gain was attributable to Premier's office, which we assume should be deemed to have been GMM's U.S. office. The Commissioner argues:

> The gain Grecian realized in 2008 and 2009 represents Grecian's share of the appreciation in value of Premier's business resulting from Premier's efforts to improve Premier's profits during Grecian's tenure as a partner. As such, the gain is attributable to Grecian's U.S. offices and is subject to U.S. tax.

The Commissioner's argument appears to be that, because the appreciation in the value of GMM's partnership interest that yielded the disputed gain when the

---

[19]Section 864(c)(5)(A) provides rules regarding attribution of U.S. offices or other fixed places of business from U.S. agents to foreign principals. The parties dispute whether such attribution of Premier's office to GMM is appropriate here. We assume, without holding, that GMM did have an office or other fixed place of business within the United States--i.e., Premier's. Because we hold that in any event the disputed gain was not "attributable to" any such office, we need not resolve this dispute.

redemption occurred was ultimately generated by activities engaged in at Premier's offices, the tax law ought to attribute that gain to those offices.

### 3. Attribution of the redemption of GMM's interest

Section 865(e)(3) provides that, in order to determine whether income from a sale is attributable to a U.S. office or fixed place of business, we must look to "[t]he principles of section 864(c)(5)", which provides rules for applying section 864(c)(4)(B) to determine what tax items are "attributable to" a U.S. office.[20] Under section 864(c)(5)(B), income, gain, or loss is attributable to a U.S. office only if: (a) the U.S. office is "a <u>material factor</u> in the production of such income", <u>and</u> (b) the U.S. office "<u>regularly carries on</u> activities of the type from which such income, gain, or loss is derived."[21] (Emphasis added.) 26 C.F.R. section 1.864-6, Income Tax Regs., refers to these two elements together as the "material factor" test, explaining "regularly carries on activities of the type", <u>see</u> sec. 864(c)(5)(B), as "realized in the ordinary course". Because the regulation employs the phrase

---

[20]By its terms, section 864(c)(4)(B) and (c)(5) does not apply to gains from dispositions of partnership interests, because such gains are not one of the three types of income denoted in section 864(c)(4)(B)(i)-(iii). Thus, section 865(e)(3) does not incorporate section 864(c)(5) per se but rather invokes only "[t]he principles of section 864(c)(5)". (Emphasis added.)

[21]The parties have not directed us to any caselaw applying these "material factor" and "ordinary course" standards, and we find none.

"in the ordinary course" in its application of the statute, we also use "ordinary course" here as a synonym for "regularly carries on activities of the type".

> a.  Whether Premier's U.S. office was a material factor in the production of GMM's disputed gain

The regulation defining what tax items are "attributable to" an office or other fixed place of business in the United States does not set a clear, objective standard. Shedding some light on what is considered to be a material factor, the regulation provides:

> For this purpose, the activities of the office or other fixed place of business shall not be considered to be a material factor in the realization of the income, gain, or loss unless they provide a significant contribution to, by being an essential economic element in, the realization of the income, gain, or loss. * * * It is not necessary that the activities of the office or other fixed place of business in the United States be a major factor in the realization of the income, gain, or loss. * * *

26 C.F.R. sec. 1.864-6(b)(1), Income Tax Regs. (emphasis added). Thus, under this regulation, a "material factor" must be "significant" and "essential" but not necessarily "major". The regulation thus leaves many unanswered questions.

The Commissioner's argument in this regard has two strands: first, that Premier's office was material to the deemed sale of GMM's portion of partnership assets; and second, that Premier's office was material to the increased value of

Premier that GMM realized in the redemption.[22] We will address these contentions in turn.

First, the Commissioner contends that GMM's redemption of its partnership interest in Premier was equivalent to Premier's selling its underlying assets and distributing to each partner its pro rata share of the proceeds. If we were to view the redemption transaction as a hypothetical sale by Premier of GMM's interest in each item of Premier's property and the remittance to GMM of the proceeds from that sale, then it might make sense to view the activities of Premier's U.S. office (which we assume attributable to GMM) as a material factor in the production of the income to GMM. However, if the Commissioner's view were correct, then it would yield an "aggregation theory" general rule that would render superfluous sections 751 and 897(g), both of which presume a contrary, "entity theory" general rule to which sections 751 and 897(g) are "aggregation theory" exceptions. Moreover, in order to view the redemption transaction as a hypothetical sale of

[22]The Commissioner's argument was essentially first explained in this litigation. Rev. Rul. 91-32, 1991-1 C.B. 107, does not address or analyze the question when an office or other fixed place of business might be a material factor in the production of redemption gain. Rather, it summarily states that the regulations which in the non-redemption context determine whether income is realized from the active conduct of a U.S. trade or business, sec. 1.864-4(c)(3), Income Tax Regs., and whether an asset is used in the active conduct of a U.S. trade or business, sec. 1.864-4(c)(2) apply. This explanation is cursory at best.

GMM's portions of partnership property, one would have to abandon, for no reason evident in the statute or the regulations, the conclusions called for by subchapter K, see supra, part II.A--i.e., that the disputed portion of the redemption proceeds is to be treated as "gain or loss from the sale or exchange of the partnership interest", sec. 731(a), which is "a [singular] capital asset", sec. 741.

As is explained above in part II.B.2, the source of income from the sale of an asset, including a capital asset, is determined by section 865. Section 865(a) provides that the source of such income as U.S. or foreign follows the residency of the taxpayer, unless one of the subsequent subsections in section 865 provides otherwise. Under section 865(e)(1)(A), the income that the U.S. office rule renders U.S. source is "income from sales * * * attributable to such office", and in the redemption GMM's income was income on the exchange of its partnership interest. It is that income--the income realized in the redemption--that must be attributable to the office. Consistent therewith, but even more focused, section 865(e)(3) indicates that the issue is "whether a sale is attributable to such an office". The actual "sale" that occurred here was GMM's redemption of its partnership interest in Premier. We conclude that, for the partnership's U.S. office to be a "material factor" in the relevant sense, that office must be material to the redemption transaction itself and the gain realized therein, rather than simply

being a material factor in ongoing, distributive share income from regular business operations. Consequently, the Commissioner's argument that Premier's U.S. office would have been a material factor for a hypothetical sale of underlying partnership assets misses the mark.

Second, focusing on the membership interest itself, the Commissioner argues in the alternative that because Premier increased the value of its underlying assets and increased its overall value as a going concern during the period that GMM was a partner, thereby increasing the value of GMM's interest, Premier's U.S. offices were an essential economic element in GMM's realization of gain in the redemption. In so arguing, the Commissioner conflates the ongoing value of a business operation with gain from the sale of an interest in that business. As we have explained previously, GMM's gain in the redemption was not realized from Premier's trade or business of mining magnesite, that is, from activities at the partnership level; rather, GMM realized gain at the partner level from the distinct sale of its partnership interest. See supra part II.A.1.

GMM points to 26 C.F.R. section 1.864-6(b)(2)(i), Income Tax Regs. (addressing "material factor" analysis in the case of "[r]ents, royalties, or gains on sales of intangible property"), and argues that Premier's efforts to increase its value as a going concern do not, without more, establish that GMM's realization

of gain on the redemption is attributable to Premier's office.  The regulation

provides:

> An office or other fixed place of business in the United States <u>shall</u>
> <u>not be considered to be a material factor in the realization of income</u>,
> gain, or loss for purposes of this subdivision <u>merely because the</u>
> <u>office or other fixed place of business</u> conducts one or more of the
> following activities:  (a) <u>Develops, creates, produces, or acquires and</u>
> <u>adds substantial value to, the property which is leased, licensed, or</u>
> <u>sold, or exchanged</u>, (b) collects or accounts for the rents, royalties,
> gains, or losses, (c) exercises general supervision over the activities
> of the persons directly responsible for carrying on the activities or
> services described in the immediately preceding sentence,
> (d) <u>performs merely clerical functions incident to the</u> lease, license,
> <u>sale, or exchange</u> or (e) exercises final approval over the execution of
> the lease, license, sale, or exchange.  * * * [<u>Id.</u>; emphasis added.]

The Commissioner dismisses this argument with the observation, correct as far as

it goes, that the regulation concerns "[r]ents, royalties, or gains on sales of

intangible property", whereas here the income at issue is different--i.e., proceeds

from the redemption of a partnership interest.  The Commissioner is correct in the

sense that this regulation is not directly on point; however, in determining whether

a sale is attributable to an office, we are directed by section 865(e)(3) to consult

not "section 864(c)(5)" (which by its terms does <u>not</u> apply here, <u>see</u> <u>supra</u> note 19)

but rather "<u>the principles of</u> section 864(c)(5)".  (Emphasis added.)  It therefore

seems we must take guidance as appropriate from section 864(c)(5) and the

regulations promulgated thereunder <u>without</u> dismissing, as the Commissioner

would, provisions that are not directly on point, since the set of provisions that are directly on point is an empty set. We acknowledge it is fair to observe that a provision applicable to one kind of income might not be suited to a "material factor" analysis for another kind of income. But we see no reason to disregard this "[r]ents, royalties", etc., provision insofar as it provides an instance in which a U.S. office that "[d]evelops" and "adds substantial value to" an income-generating asset is nonetheless <u>not</u> a "material factor" in the realization of income from that asset. GMM reasonably derives from this regulation the principle that the creation of underlying value is simply a distinct function from being a material factor in the realization of income in a specific transaction.

The material factor test is not satisfied here because Premier's actions to increase its overall value were not "an essential economic element in the realization of the income", 26 C.F.R. sec. 1.864-6(b)(1), that GMM received upon the sale of its interest. Increasing the value of Premier's business as a going concern, without a subsequent sale, would not have resulted in the realization of gain by GMM.

To be sure, GMM's investment in Premier increased in value, presumably from Premier's business activities; but GMM did not realize gain from holding its interest in Premier until that amount became liquid, that is, until its partnership

interest was redeemed. The regulations call for this focus in two ways--by providing that adding value alone is not a material factor, see id. subpara. (2)(i)(a), and by providing that performing merely clerical functions incident to the sale or exchange (i.e., a reasonable description of Premier's role in effecting the liquidation)[23] is not a material factor, see id. subdiv. (i)(d). Thus, Premier's efforts to develop, create, or add substantial value to the property sold are not considered to be a material factor in the realization of the disputed gain pursuant to 26 C.F.R. section 1.864-6(b)(1), and the Commissioner therefore fails to show that the first test for attributing the disputed gain to a U.S. office--"material factor"--is met.

>    b.    Whether GMM's disputed gain was realized in the
>           ordinary course of Premier's business

The second part of the U.S.-source attribution inquiry--"ordinary course"-- is found in 26 C.F.R. section 1.864-6(b)(1), which provides:

> [I]ncome, gain, or loss is attributable to an office or other fixed place of business which * * * a foreign corporation has in the United States only * * * if the income, gain, or loss is realized in the ordinary course of the trade or business carried on through that office or other fixed place of business. * * * [Emphasis added.]

---

[23]The Commissioner would dispute the reasonableness of that description, but in part IV.B.3.b below we discuss the nature and modest quantum of Premier's activity in the redemption.

Even if we were to decide that Premier's office was a "material factor" in the production of the disputed gain (which we do not), we would also need to find that the disputed gain was realized in the ordinary course of Premier's business conducted through its U.S. office in order for the gain to be attributable to that office, and thereby to be U.S.-source income.[24]

As required by its bylaws, Premier extended to GMM an offer to redeem its interest according to the terms of Premier's prior transaction with IMin. GMM accepted Premier's offer without any negotiation of the terms of the deal.

According to GMM, the redemption of its interest in Premier was a one-time, extraordinary event and therefore was not undertaken in the ordinary course of Premier's business. GMM argues that Premier's U.S. office is in the business of selling and producing magnesite, not buying and selling partnership interests. Because the disputed gain was realized in the redemption of GMM's partnership interest in Premier, not from Premier's ordinary business--magnesite production and sale--it does not satisfy the ordinary course requirement and is not U.S. source.

---

[24]Rev. Rul. 91-32 supra, makes no mention of the "ordinary course" prong of the "attributable to" analysis, and this detracts from the persuasiveness of its conclusion that gain such as the disputed gain is attributable to U.S. offices.

The Commissioner disagrees with GMM's characterization of Premier, and points to Premier's other actions--admitting a new partner and redeeming IMin's interest--to show that Premier's redemption of GMM's interest was not an isolated event. The Commissioner takes the position that the wording of section 865(e)(2)(A) ("any sale of personal property") is broad enough to cover all sales of personal property, including occasional sales. The Commissioner explains:

> The language of section 864(c)(5)(B) does not require that the sale of personal property occur regularly; it requires that the type of activities giving rise to the income occur regularly. In this regard, the language is amply broad to support attribution to an office of income from an occasional sale of personal property, if the gain on the sale is derived from the business activities regularly conducted through the office or other fixed place of business. [Emphasis added.]

The Commissioner again conflates the ongoing income-producing activities of Premier (magnesite production and sale), which certainly occurred in the ordinary course, and the redemption of GMM's partnership interest in Premier, which was an extraordinary event; and he thereby would effectively eliminate the "ordinary course" test and would allow the "material factor" test to stand for both tests. Premier's business did regularly produce income (and GMM paid tax on its distributive share of that income each year). However, contrary to the Commissioner's assertion, Premier was not engaged in the business of buying or

selling interests in itself and did not do so in the ordinary course of its business. Premier engaged in only two such transactions (other than the redemption of GMM's interest) over the course of seven years, and this quantum of activity is not sufficient to show that Premier was in the business of redeeming and selling partnership interests. Rather, Premier is of course in the business of producing and selling magnesite products, and therefore GMM's gain realized on the redemption of its partnership interest in Premier was not realized in the ordinary course of the trade or business carried on through Premier's U.S. offices.

Since we have held that GMM's disputed gain on its redemption was not attributable to a U.S. office or other fixed place of business, it is therefore not U.S.-source income under section 865(e)(2)(A). As noted above, the Commissioner concedes that the disputed gain is not one of the types of foreign-source income treated as effectively connected by section 864(c)(4)(B). Consequently, the disputed gain is not effectively connected income.

V.    Penalties

After audit the IRS determined that GMM is liable for additions to tax under section 6651(a) and an accuracy-related penalty under section 6662(a). GMM asserts a defense, which we sustain.

A.    Applicability of accuracy-related penalty for 2008

Section 6662(a) and (b)(1) and (2) imposes an "accuracy-related penalty" of 20% of the portion of the underpayment of tax that is attributable to the taxpayer's negligence or disregard of rules or regulations or that is attributable to any substantial understatement of income tax.  An understatement of a corporation's income tax is substantial if it exceeds the greater of 10% of the tax required to be shown on the return or $10,000.  Sec. 6662(d)(1)(B).  The Commissioner asserts that GMM's understatements of income tax were substantial and that GMM was negligent in the preparation of its returns for 2008 and 2009.

Since GMM has conceded that on the redemption of its partnership interest it realized FIRPTA gain of over $1 million for 2008 but reported zero of that gain on its 2008 tax return, the substantial understatement penalty imposed by section 6662(d) is applicable here (subject to the defense described below).

B.    Applicability of failure-to-file and failure-to-pay additions to tax for 2009

Section 6651(a)(1) authorizes the imposition of an addition to tax for failure to file a timely return (unless the taxpayer proves that such failure is due to reasonable cause and is not due to willful neglect).  Section 6651(a)(2) provides for an addition to tax for failure to timely pay "the amount shown as tax on any

return specified in paragraph (1)" unless the taxpayer establishes that the failure was due to reasonable cause and not willful neglect. The amount of the addition to tax under section 6651(a)(2) reduces the addition to tax under section 6651(a)(1) for any month for which both additions to tax apply. See sec. 6651(c)(1). When a taxpayer has not filed a return, the section 6651(a)(2) addition to tax may not be imposed unless the Secretary has prepared an SFR that meets the requirements of section 6020(b). Wheeler v. Commissioner, 127 T.C. 200, 208-209 (2006), aff'd, 521 F.3d 1289 (10th Cir. 2008). Pursuant to section 6651(g)(2), an SFR prepared by the Commissioner under section 6020(b) is treated as a taxpayer return for purposes of determining the addition to tax under section 6651(a)(2).

Although we have found that the disputed portion of GMM's gain on the redemption of its partnership interest was not taxable in the United States, GMM has conceded that $1.2 million of its 2009 gain was taxable, pursuant to the FIRPTA rules of section 897(g). GMM did not file a 2009 Form 1120-F reporting this gain nor pay the tax on that gain (as reported on the IRS's SFR). Therefore, as a threshold matter, the additions to tax imposed by section 6651(a)(1) and (2) are applicable here (subject to the defense described below).

C.     Reasonable cause defenses

The section 6662(a) accuracy-related penalty and the additions to tax

pursuant to section 6651(a)(1) and (2) are each subject to a "reasonable cause"

defense.  The defenses arise from distinct statutory sources, but where a taxpayer

asserts reasonable cause as a defense from liability for all three because he relied

on the advice of a competent adviser, the defenses overlap significantly.  We

therefore discuss them in conjunction below.

1.     Reasonable cause for failure to file and failure to pay

The failure-to-file and failure-to-pay additions to tax are applied "unless it is

shown that such failure is due to reasonable cause and not due to willful neglect".

Sec. 6651(a)(1) and (2).  26 C.F.R. section 301.6651-1(c), Proced. & Admin.

Regs., provides:

> If the taxpayer exercised ordinary business care and prudence and
> was nevertheless unable to file the return within the prescribed time,
> then the delay is due to a reasonable cause.  A failure to pay will be
> considered to be due to reasonable cause to the extent that the
> taxpayer has made a satisfactory showing that he exercised ordinary
> business care and prudence in providing for payment of his tax
> liability * * *.

"Whether the elements that constitute 'reasonable cause' are present in a given

situation is a question of fact", answered on the basis of the circumstances of the

individual case.  United States v. Boyle, 469 U.S. 241, 249 n.8 (1985).  "[W]illful

neglect" is defined as "a conscious, intentional failure or reckless indifference." Id. at 245.

Circumstances that constitute reasonable cause include good-faith reliance on a mistaken legal opinion of a competent tax adviser that no liability was due and that it was unnecessary to file a return. Id. at 250-251; McMahan v. Commissioner, 114 F.3d 366, 369 (2d Cir. 1997) ("[R]eliance on a mistaken legal opinion of a competent tax adviser--a lawyer or accountant--that it was unnecessary to file a return constitutes reasonable cause"), aff'g T.C. Memo. 1995-547. As the Supreme Court articulated in Boyle, 469 U.S. at 251:

> When an accountant or attorney advises a taxpayer on a matter of tax law, such as whether a liability exists, it is reasonable for the taxpayer to rely on that advice. Most taxpayers are not competent to discern error in the substantive advice of an accountant or attorney. To require the taxpayer to challenge the attorney, to seek a "second opinion," or to try to monitor counsel on the provisions of the Code himself would nullify the very purpose of seeking the advice of a presumed expert in the first place. * * * "Ordinary business care and prudence" do not demand such actions.

### 2. Reasonable cause for an underpayment

Similarly, under section 6664(c)(1), if a taxpayer who is otherwise liable for the accuracy-related penalty can show, first, "that there was a reasonable cause" for the underpayment and, second, that he "acted in good faith with respect to" the underpayment, then no accuracy-related penalty "shall be imposed". Whether the

taxpayer acted with reasonable cause and in good faith depends on the pertinent facts and circumstances, including his efforts to assess his proper tax liability, his knowledge and experience, and the extent to which he relied on the advice of a tax professional. 26 C.F.R. sec. 1.6664-4(b)(1), Income Tax Regs. "Reliance on * * * professional advice, or other facts, however, constitutes reasonable cause and good faith if, under all the circumstances, such reliance was reasonable and the taxpayer acted in good faith." Id.

The Court's caselaw sets forth the following three requirements for a taxpayer to use reliance on a tax professional to avoid liability for a section 6662(a) penalty: "(1) The adviser was a competent professional who had sufficient expertise to justify reliance, (2) the taxpayer provided necessary and accurate information to the adviser, and (3) the taxpayer actually relied in good faith on the adviser's judgment." Neonatology Assocs., P.A. v. Commissioner, 115 T.C. 43, 99 (2000), aff'd, 299 F.3d 221 (3d Cir. 2002). The Commissioner does not contend that GMM did not provide necessary and accurate information to the adviser; accordingly we turn to the other elements of the reasonable cause defense.

### 3. GMM's reliance on professional advice

GMM is a Greek corporation whose partnership investment in Premier was its only involvement in U.S. business. GMM's central financial officer, Mr. Lomvardos, did not understand the concept of a partnership for U.S. tax purposes, nor that GMM would be subject to tax in the United States on income from real property located there. He and GMM were generally ignorant of U.S. tax laws.

To hire a tax professional to comply with U.S. tax laws, GMM relied on the recommendation of its trusted adviser, Mr. Phufas, who recommended Mr. Rose. Mr. Rose has a bachelor of arts degree from Columbia College, a master of business administration degree from Columbia University Graduate School of Business, and a juris doctorate from St. John's University School of Law; and he is a certified public accountant licensed in the State of New York. At the time GMM hired him, Mr. Rose had been preparing U.S. income tax returns for 40 years. Mr. Rose spent 30% to 40% of his time preparing income tax returns for a wide variety of clients, including partnerships. Mr. Rose believed that he was qualified to prepare the Forms 1120-F for GMM, and GMM likewise believed he was so qualified.

Thereafter GMM relied completely on Mr. Rose to prepare its tax returns. Mr. Rose made the decision that GMM did not have to report any of its gain on the redemption of its membership interest in Premier on either its 2008 or 2009 tax return, and no one from GMM questioned that decision.

The Commissioner argues that GMM's reliance on Mr. Rose was not in good faith. The Commissioner finds fault with the fact that GMM relied on Mr. Phufas' recommendation of Mr. Rose when GMM hired him to prepare its tax returns, rather than conducting an investigation of Mr. Rose's background and experience in tax return preparation at the time. Given what little GMM knew about the U.S. system of taxation, we cannot imagine GMM would have known how to conduct such an investigation, let alone what value such uninformed inquiries would have added. GMM acted reasonably, given its admitted inexperience: It relied on the recommendation of its trusted adviser, Mr. Phufas, when it chose to hire Mr. Rose.

The Commissioner also makes much of the fact that GMM did not hire an expert who specialized in international tax law or an attorney with an LL.M. degree. It is true that Mr. Rose does not hold an LL.M. degree in taxation, nor did he claim to be an international tax law expert. But this is not the standard for the reasonable cause defense. To determine whether a taxpayer can avoid liability for

a penalty on the basis of his reliance on the advice of a tax professional, we look to see that "[t]he adviser was a competent professional who had sufficient expertise to justify reliance". Neonatology Assocs., P.A. v. Commissioner, 115 T.C. at 99. Mr. Rose was a licensed attorney and certified public accountant who had spent nearly 40 years preparing income tax returns, and he had accurately prepared GMM's returns for 4 years before the years here in issue. We find that Mr. Rose had sufficient credentials to justify GMM's reliance.

We find that GMM had reasonable cause for its failure to report the FIRPTA gain on its 2008 return and for its failure to file a 2009 return and pay the 2009 tax, on the basis of its reliance, in good faith, on the advice of its competent professional tax adviser. We therefore hold that GMM is not liable for the section 6662 accuracy-related penalty for 2008 nor the additions to tax under section 6651(a)(1) and (2) for 2009.

To reflect the foregoing and the parties' concessions,

Decision will be entered under

Rule 155.